IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JEFFREY D. MANN, | ) | CASE NO. 1:13 CV 1977 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | WILLIAM H. BAUGHMAN, JR. |
| JERRY SPATNEY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | **REPORT & RECOMMENDATION** |
| | ) | |

# Table of Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-
    A.    Summary judgment standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-
    B.    Claims asserted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-
        1.    Free exercise claims - Religious Land Use and Institutionalized
            Persons Act ("RLUIPA") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-
            a.    Exhaustion of remedies . . . . . . . . . . . . . . . . . . . . . . . . . -10-
            b.    Sacred herbs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-
            c.    Pipe/spiritual leader/prison library . . . . . . . . . . . . . . . . -14-
            d.    Smudging . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-
            e.    Holy days . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-
            f.    Sweat lodge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -21-
            g.    First Amendment/free exercise . . . . . . . . . . . . . . . . . . . -22-
        2.    Retaliation - § 1983 claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . -22-
            a.    The shipment containing tobacco . . . . . . . . . . . . . . . . . -23-
            b.    Strip search/cell search/mail delivery . . . . . . . . . . . . . . -30-
            c.    *Respondeat superior* . . . . . . . . . . . . . . . . . . . . . . . . . . . . -34-

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -34-

## Introduction

Before me by referral[1] in the matter of Jeffrey D. Mann's *pro se* prisoner civil rights action under 42 U.S.C. § 1983 against Gary C. Mohr, *et al.*,[2] is Mann's motion for partial summary judgment,[3] as supplemented,[4] to which defendants have responded with their own motion for summary judgment.[5] Mann has replied.[6] For the reasons that follow, Mann's motion should be denied and the defendants' motion should be granted. If this recommendation is accepted, all remaining pending motions[7] requesting class certification and appointment of counsel for the proposed class should be dismissed as moot.

## Facts

This case, as modified by prior order of this Court, now raises a single claim that 14 individuals at the Grafton Correctional Institution infringed on Mann's right to practice his Native American religion.[8] Within that single claim are two sub-claims: (1) that defendants

---

[1] ECF # 14.

[2] ECF No. 5 (amended complaint).

[3] ECF No. 134.

[4] ECF No. 141.

[5] ECF No. 138.

[6] ECF No. 146.

[7] ECF Nos. 133, 142, 143, 144.

[8] ECF No. 73.

-2-

Jackson and Chaplain Smith denied Mann the right to practice his religion;[9] and (2) that all defendants except Wanza Jackson intimidated Mann for seeking to practice his religion and retaliated against him for making those requests.[10]

Specifically, Mann alleges that:

- The GCI chapel library contains no materials related to Native American religious belief, but does contain material concerning other religions, thus effectively preventing precluding Mann from freely exercising his religious beliefs;[11]

- To effectively practice the Native American religion, believers must be allowed to conduct a Sacred Pipe ceremony, which requires access to Kinnickinnick – an herbal smoking mixture consisting of leaves or bark – and a pipe; access to a sweat lodge at least monthly; the observance of certain holy days, such as both solistices and equinoxes; the practice of at least weekly smudging, which requires the burning of sage, sweetgrass, cedar, and juniper, with sacred smoke used to purify; and the presence of an outside spiritual advisor;[12]

- The defendants here have refused to accommodate practitioners of Native American religion while "providing facilities and access for other 'mainstream' religions";[13]

- Despite the fact that Mann purportedly received authorization from defendant Chaplain Smith to purchase sage, sweetgrass, a pipe, and kinnickinnick, the resulting delivery was confiscated and Mann was subjected to a disciplinary

---

[9] ECF No. 5 at ¶¶ 50-109.

[10] *Id.* at 199-213.

[11] ECF No. 134, Attachment 1 at 5.

[12] *Id.* at 6-10.

[13] *Id.* at 10.

proceeding for allegedly lying to the staff about Chaplain Smith's approval of the delivery;[14]

• Additional retaliation occurred when Chaplain Smith threatened to put Mann in segregation if he filed a grievance about this conduct, and when Mann was harassed with strip searches and cell searches, allegedly looking for contraband, which was never found;[15]

• Further retaliation occurred when Mann was denied medical care when requested and after properly completing the requisite approval process.[16]

## Analysis

### A.    Summary judgment standards

The court should grant summary judgment if satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[17]  The moving party bears the burden of showing the absence of any such "genuine issue":

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.[18]

---

[14] *Id.* at 17-18.

[15] *Id.* at 18-19.

[16] *Id.* at 20.

[17] Fed. R. Civ. P. 56(c).

[18] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56(c)).

A fact is "material" only if its resolution will affect the outcome of the lawsuit.[19] Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.[20]  The court will view the summary judgment motion "in the light most favorable to the party opposing the motion."[21]

The court should not grant summary judgment if a party who bears the burden of proof at trial does not establish an essential element of his case.[22]  Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."[23] Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.[24]

In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict."[25]  But if the non-moving party faces a heightened burden of

---

[19] *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

[20] *Id.* at 252.

[21] *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

[22] *McDonald v. Petree*, 409 F.3d 724, 727 (6th Cir. 2005) (citing *Celotex Corp.*, 477 U.S. at 322).

[23] *Leadbetter v. Gilley*, 385 F.3d 683, 689 (6th Cir. 2004) (quoting *Anderson*, 477 U.S. at 248-49).

[24] *Anderson*, 477 U.S. at 249-50 (citation omitted).

[25] *Id.* at 252.

proof, such as clear and convincing evidence, it must show that it can produce evidence which, if believed, will meet the higher standard.[26]

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmover.[27]  The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury."[28]  The text of Fed. R. Civ. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

"In other words, the movant can challenge the opposing party to 'put up or shut up' on a critical issue."[29]

Though parties must produce evidence in support of and in opposition to a motion for summary judgment, not all types of evidence are permissible.  The Sixth Circuit has concurred that "'it is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.'"[30]  Rule 56(e) also has certain, more specific requirements:

---

[26] *March v. Levine*, 249 F.3d 462, 471 (6th Cir. 2001).

[27] *Anderson*, 477 U.S. at 256.

[28] *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

[29] *BDT Prods. v. Lexmark Int'l*, 124 F. App'x 329, 331 (6th Cir. 2005).

[30] *Wiley v. United States*, 20 F.3d 222 (6th Cir. 1994) (quoting *Beyene v. Coleman Sec. Servs.*, 854 F.2d 1179, 1181 (9th Cir. 1988)).

> [it] requires that affidavits used for summary judgment purposes be made on the basis of personal knowledge, set forth admissible evidence, and show that the affiant is competent to testify. Rule 56(e) further requires the party to attach sworn or certified copies to all documents referred to in the affidavit. Furthermore, hearsay evidence cannot be considered on a motion for summary judgment.[31]

But the district court may consider evidence not meeting this standard unless the opposing party affirmatively raises the issue of the defect. The burden is on the opposing party to object to the improper evidence; failure to object constitutes a waiver.

> If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived, and [the Sixth Circuit] will review such objections only to avoid a gross miscarriage of justice.[32]

As a general matter, the judge considering a motion for summary judgment need examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law."[33] The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter.[34] The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[35]

In sum, proper summary judgment analysis entails:

---

[31] *Id.* at 225-26 (citations omitted).

[32] *Id.* at 226 (citations omitted).

[33] *Anderson*, 477 U.S. at 248.

[34] *Id.* at 249.

[35] *Id.*

-7-

the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.[36]

**B.    Claims asserted**

*1.    Free exercise claims - Religious Land Use and Institutionalized Persons Act ("RLUIPA")*

As set out by the Supreme Court, Congress enacted the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000bb, *et seq.*, and in particular, section three of that Act, to govern religious exercise by institutionalized persons.[37] RLUIPA provides that the government shall not impose a "substantial burden" on the religious exercise of an institutionalized person, even if the burden results from a rule of general applicability, unless the government can show that the burden (1) is in furtherance of a compelling government interest and (2) is the least restrictive means of furthering that interest.[38]

Congress broadly defined religious exercise to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."[39] Congress mandated that this concept of religious exercise "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter

---

[36] *Id.* at 250.

[37] *Holt v. Hobbs*, – U.S. – , 135 S. Ct. 853, 860 (2015).

[38] *Id.* (citing statute).

[39] *Id.* (quoting § 2000cc-5(7)).

-8-

and the Constitution."[40]  Moreover, Congress stated that the RLUIPA "may require a government to incur expenses in its own operation to avoid imposing a substantial burden on religious exercise."[41]

In maintaining an action under the RLUIPA, a plaintiff bears the initial burden of showing that the policies in place concerning his religion, and the actions taken by any individual defendants in furthering that policy, substantially burden his religious exercise.[42]  Should a plaintiff make this initial showing, the burden then shifts to the government to show that its policies, and the acts of any individual defendants taken in pursuit of those policies, both furthered a compelling government interest and were the least restrictive means by which those interests could be furthered.[43]

RLUIPA requires that the inquiry be highly focused on the application of the challenged policy to the particular claimant.[44]  Reviewing courts must scrutinize any asserted harm accruing to the government from allowing specific exemptions to policy for particular claimants and look to the marginal interest in enforcing the challenged government action in that particular context.[45]

---

[40] *Id.* (quoting § 2000cc-3(g)).

[41] *Id.* (quoting § 2000cc-3(c)).

[42] *Id.* at 862.

[43] *Id.* at 863.

[44] *Id.*

[45] *Id.*

Again, the initial burden for a RLUIPA plaintiff is to establish that his religious exercise was substantially burdened.[46] This test must be applied to the various particular claims asserted by Mann.

### a. *Exhaustion of remedies*

The Prison Litigation Reform Act[47]requires that inmates exhaust available administrative remedies before filing civil actions, even if the relief available through civil suits may be greater than that available through administrative proceedings.[48] Here, Mann asserts and the record indicates that Mann raised all the claims presented against defendants Reynolds, Rudy, Teffs, and Smith have been fully exhausted according to the applicable regulations in prior administrative grievances submitted to the prison authorities.[49]

Defendants Glowecki, Costin, Scott, and Lumen argue that the claims against them have not been properly exhausted.[50] Those arguments are discussed below under the section dealing with the § 1983 retaliation claims asserted against them.

---

[46] *Id.* at 860.

[47] 42 U.S.C. § 1997e(a)(1996).

[48] *Woodford v. Ngo,* 548 U.S. 81, 84-85 (2006).

[49] *See* ECF No. 5, Ex. 2. These named defendants appear to agree that these claims have been exhausted. *See* ECF No. 138 at 39 (raising failure to exhaust only as to other named defendants).

[50] ECF No. 138 at 39-40.

Further, at least some claims against defendants Kelly,[51] Krandall,[52] Garcia, and Murphy, arguably may have been presented in the prison grievance process. But these claims, which essentially maintain that these defendants failed to properly supervise the actions of other defendants or acted improperly in the roles as part of prison administration or the prison grievance process, are considered below in the section dealing with the inapplicability of § 1983 to claims of *respondeat superior*.

Listed defendants Wanza Jackson, asserted to be the religious services administrator for the Ohio Department of Rehabilitation and Corrections,[53] and Jerry Spatney, asserted to be the deputy warden of the Grafton Correctional Institution,[54] also may have been at least partially included at some level in Mann's prison grievances. But, as with the previously mentioned defendants in supervisory positions, any claims against these defendants are likewise addressed below in the discussion concerning § 1983 and *respondeat superior*.

**b.** ***Sacred herbs***

Mann alleges in his complaint that juniper and kinnickinnick are "not permitted at all, even under controlled conditions."[55] The unrebutted affidavits from the defendants

---

[51] Kelly was replaced as a defendant by LaShuan Eppinger. ECF No. 83.

[52] Krandall was replaced as a defendant by Tina Grudzien. ECF No. 83.

[53] ECF No. 5 at ¶ 10.

[54] Mann has moved that Spatney be replaced as a defendant by Ron Armbruster. ECF No. 115.

[55] ECF No. 134 at 8 (citing complaint).

-11-

state that juniper is not prohibited by the prison and could be requested by Mann, but was not.[56]  Morever, an unrefuted affidavit from Chaplain Smith attests that kinnickinnick, as a substitute for tobacco, is approved for use in Native American rituals and is permitted in prisons.[57]  It is also uncontested that Mann was actually able to order kinnikinnick.[58]

In fact, the uncontested evidence is that Mann was able to receive the various sacred herbs he actually sought.[59] Thus, the uncontested evidence is that the herbs required for the smudging ceremony are not prohibited by the prison.

Mann appears to concede that Native American ritual supplies can be requested, but argues that the necessity of making such a request – which he asserts is not needed in cases of "mainstream religions" – imposes added burdens, such as shipping charges, on practitioners of Native American religion.[60]  Initially, as Mann implicitly acknowledges, there is no requirement in RLUIPA or otherwise that the government provide free religious articles to inmates.[61]  As the government here states, the practice is that religious items are either donated for subsequent distribution to inmates, such as is the case with

---

[56] ECF No. 138 at 16 (citing record).

[57] *Id.* at 17 (citing record).

[58] *Id.* at 17 (citing record).

[59] *Id.*

[60] ECF No. 136 at 8.

[61] *Blake v. Rubenstein*, No. 2:08-0906, 2016 WL 5660355, at *22 (S.D. W. Va. April 5, 2016)("[Prisons]  are clearly not required to purchase religious items for inmates in order for them to practice their religion.")

library materials,[62] or inmates are permitted to order such materials themselves for their personal use.[63]

The gravamen of Mann's complaint in this instance is not that he has been refused the ability to order these items.  Rather, it is that because the government included some religious items from other religions in a catalog from which inmates may order items without prior approval, which were then shipped in combination with other orders, prisoners like Mann, who independently ordered religious goods from other sources, were required to obtain separate approval from prison authorities for these purchases and then pay separate shipping charges.[64]

In *Blake v. Rubenstein*,[65] the inmate similarly complained that the prison commissary did not carry sufficient personal hygiene products, such as soap, that were free from all animal ingredients.[66]  The inmate, as here, argued that being required to personally pay for supplemental hygiene items substantially burdened the practice of his Hare Krishna religion.[67]  The district court disagreed, finding that requiring the inmate to purchase

---

[62] ECF No. 138 at 18 (citing record).

[63] *Id.*  No "special permission" is involved in specifically ordering religious items from an outside vendor; only the same process as applies to all orders from any outside vendor, whereby the order is reviewed to be sure it does not involve contraband. ECF No. 138 at 22 (citing record).

[64] ECF No. 134 at 8.

[65] *Blake*, 2016 WL 5660355.

[66] *Id.* at *21.

[67] *Id.*

-13-

supplemental hygiene items acceptable to the Hare Krishna religion does not impose a substantial burden on the practice of that religion.[68]  Noting first, as in this case, that the inmate was not restricted from purchasing the items he desired, the court further noted that requiring an individual to purchase his own supplemental religiously acceptable items was, at most, only a "mere inconvenience"and not a substantial burden.[69]  Finally, the court observed that this practice of requiring individual purchases of religious items was the least restrictive way of furthering the compelling government interest of being cost effective and equitable in dealing with the wide variety of items that may be requested by inmates with multiple religious beliefs and practices.[70]

Consistent with the reasoning in *Blake*, and upon the uncontroverted evidence in this case cited above, Mann has not shown that the prison has substantially burdened the exercise of his religion by their policy or actions as to Mann obtaining sacred herbs.

### c.    *Pipe/spiritual leader/prison library*

As to the lack of a minister for a sacred pipe ceremony and the claimed absence of materials on Native American religion from the prison library, the record shows that all ministers in prison facilities are volunteers[71]and all library materials are donated.[72]  Further,

---

[68] *Id.* at *22.

[69] *Id.*

[70] *Id.*

[71] ECF No. 138 at 13 (citing record).

[72] *Id.* at 18 (citing record).

in order for any organized religious service – such as a sacred pipe ceremony – to be conducted in the prison, Ohio prison regulations state that: (1) there must be a valid leader present; (2) there must be at least 5 inmates who practice that religion and desire an organized service; and (3) a qualified leader must be identified and be willing to volunteer.[73]

The unrebutted evidence in this record is that there are only three documented practitioners of the Native American religion at this prison and that Mann has never approached the chaplain with the name of a potential Native American religious leader willing to volunteer to lead services.[74]  Under the prison regulation, these deficiencies would preclude any further action by the prison toward obtaining a Native American religious leader at this prison.

Even if Mann could show that he did request that a Native American religious leader be provided for organized services, including a sacred pipe ceremony, and/or furnish the name of a potentially qualified leader and volunteer, the government has shown that it has a compelling interest in restricting such services to only groups that have at least five inmates.[75]  Specifically, as the Sixth Circuit observed in *Spies v. Voinovich*,[76] this policy of requiring that at least five inmates be involved in a religious group before permitting that group to operate within the prison bears a valid relationship to the legitimate penalogical

---

[73] *Id.* at 13.

[74] *Id.* at 14 (citing record).

[75] *Id.* at 14-15 (citing record).

[76] *Spies v. Voinovich*, 173 F.3d 398 (1999).

objectives of maintaining security and allocating limited prison resources.[77]  More recently, in *Colvin v. Caruso*,[78] the Sixth Circuit re-emphasized that it "has consistently permitted prisons to take into account the level of inmate interest in a particular religion when determining whether to hold services."[79]

In this regard, Mann's frequent attempts to create an issue over the prison's purported favoritism toward other religions as opposed to the Native American religion – *i.e.*, by allegedly permitting spiritual advisors from other religions while not "provid[ing] a spiritual advisor to facilitate the practices of the Native American Religion"[80] – does not address the fact, as noted above, that the Sixth Circuit in *Spies* has approved of the regulation that requires that five inmates be identified as belonging to a religious group within a prison before that group may have access to prison facilities.  The government, as previously noted, has provided unrefuted evidence that there are only three practitioners of the Native American religion at this prison.

Consistent with the regulation approved of in *Spies*, the government here has a valid interest in not taking any further actions toward obtaining a Native American spiritual

---

[77] *Id.* at 404-05.

[78] *Colvin v. Caruso*, 605 F.3d 282 (6th Cir. 2010).

[79] *Id.* at 291 (collecting cases).

[80] *See* ECF No. 134 at 7.

-16-

advisor, nor toward arranging any ceremonies requiring the presence of such an advisor, given the relative lack of Native American practitioners at this prison.[81]

As to the materials in the prison library, the Sixth Circuit in a 2010 RLUIPA case has held that prisons have no requirement to keep a certain number of religious books in the library, and that a prisoner's right to read religious books is protected where an inmate's access to religious reading material from the outside is not "unduly restricted."[82]  Here, there are no facts in this record from which to conclude that Mann has requested religious reading matter from outside the prison and then been refused delivery.  To the contrary, the record here shows that there is nothing in prison policy or practice to prevent Mann from ordering religious books, CDs, or videos from the outside for his own use.[83]

### d.   *Smudging*

Although Mann has complained about not being able to obtain juniper for smudging, addressed above, another essential complaint as to smudging appears to be that the prison refuses to permit access to any location within the prison, or outside it, for smudging.[84]  That said, Mann also states that smudging is permitted, but he is dissatisfied with the manner by which it is done.[85]

---

[81] Again, Mann has offered no candidates to the prison who may be available as a volunteer for such duties.

[82] *Colvin*, 605 F.3d at 292 (internal citation and quotation omitted).

[83] ECF No. 138 at 18 (citing record).

[84] ECF No. 134 at 10 (citing record).

[85] ECF No. 5, Attachment 3 at ¶ 16.

The record here shows that the individual practice of smudging is provided at all Ohio prisons.[86]  At this prison, a weekly time is provided for smudging.[87]  According to an affidavit from the chaplain, only two or three inmates at this prison smudge on a weekly basis, and Mann is not one of them.[88]  In fact, the uncontested evidence is that Mann has only once engaged in smudging.[89]

The record shows that the practice of smudging is available at this facility, and further that the practice of smudging is unaffected by the requirement that at least five inmates practice it.[90]  Thus, Mann has not shown that there is any impermissible restriction on his exercising his religion as to smudging.

### e. *Holy days*

Mann contends, without more, that the prison does not "acknowledge" any holy days for the Native American religion.[91]  He further argues that his complaint here is really about denying "access" to "ceremonies and celebrations and feasts necessary to recognize and

---

[86] ECF No. 138 at 15 (citing record).

[87] *Id.* at 15-16.

[88] *Id.* at 16.

[89] *Id.*

[90] The government refers with particularity to the "individual worship practice of smudging," presumably to differentiate it from communal or congregate practices. *See* ECF No. 138 at 15.

[91] ECF No. 5 at ¶ 73.

celebrate Holy Days for the Native American religion" while providing worship ceremonies and recognition of holy days for other religions.[92]

In response, the prison points out that the vernal equinox on March 20, the summer solstice on July 21, and the autumnal equinox on September 22 are all recognized as holy days of observance for practitioners of the Native American religion.[93]  Moreover, the prison contends that Mann's general complaints about not being able to celebrate the holy days do not state a claim for relief.[94]

In addition, the prison states that Mann is always free to engage in personal prayer, and further states that Mann is free to request any special meal for a holy day but has never done so.[95]  Absent any specifics as to what meal is needed to celebrate a holy day, and what response was made when such a meal was actually requested, the prison argues that Mann has not shown exactly how any prison policy or action has substantially burdened his exercise of religion as to holy days.[96]

---

[92] ECF No. 134 at 13.

[93] ECF No. 138 at 20 (citing record). The written Ohio Department of Rehabilitation and Correction policy on the Native American religion states that "there is no set calendar of holidays or holiday observances" for the Native American religion. ECF No. 5, Ex. C at 3. The Native American holidays listed above, together with the applicable dates and manner of observance at the prison, are set forth at ECF No. 138, Ex. E.

[94] ECF No. 138 at 21.

[95] *Id.*

[96] *Id.*

The prison's position is well-taken.  Mann seems to be contending, in only very general terms, that holy days of other religions are observed in this facility with greater ceremony than are the holy days of his religion.  Without real specifics, that sentiment provides nothing for a court to adjudicate.  The district court in *Brinkman v. Schiro*[97] likewise considered a general, conclusory allegation that claimed provision for the religious needs of Wiccan inmates was worse at the plaintiff's facility than at other facilities.[98]  The court found that "unsupported and conclusory claims regarding practices at other facilities are insufficient to create a material fact dispute" that the plaintiff's exercise of his religion was substantially burdened at the specific facility where he was incarcerated.[99]  Indeed, the court stated that absent "detailed facts and supporting evidence," a "conclusory, self-serving" claim of unequal treatment will not create a dispute of material fact.[100]

Accordingly, this element of Mann's complaint does not create a dispute of material fact as to whether this prison in some way substantially burdened his observance of Native American holy days.

---

[97] *Brinkman v. Schir*o, No. CV 08-0670-TUC-FRZ, 2013 WL 11311260 (D. Az. March 20, 2013).

[98] *Id.* at **5-6.

[99] *Id.* at *6 (citations omitted).

[100] *Id.*

### f.  *Sweat lodge*

Mann submitted a request to the prison that a "sweat lodge ceremony should be held at least once per month in a designated area."[101]  The prison responded that although other prisons with higher numbers of Native American inmates do have sweat lodges, "there is no requirement in the Native American policy that sweat lodges must be available."[102]  According to the prison, the sweat lodge in those institutions is because volunteers come to the institution to conduct the sweat lodge ceremony.[103]

In *Haight v. Thompson*,[104] the Sixth Circuit considered a RLUIPA complaint from a group of  Kentucky death-row inmates whose request for access to a sweat lodge was denied by the prison on the ground that "this issue needs to be investigated further."[105]  The *Haight* court concluded that Kentucky's response was insufficient, noting that Kentucky appears to have permitted a *de facto* absolute ban on sweat lodges to exist without examining the sweat lodges that are accommodated in prisons located in other states.[106]

Here, the response by the prison is not a *de facto* ban on sweat lodges, created by bureaucratic dodging, weaving, and delaying.  Rather, the prison's straightforward response

---

[101] ECF No. 5, Ex. 5.

[102] *Id.* at Ex. 13.

[103] *Id.*

[104] *Haight v. Thompson*, 763 F.3d 554 (6th Cir. 2014).

[105] *Id.* at 560.

[106] *Id.* at 563.

was to point out that sweat lodges are possible and are present in other Ohio prisons, but only where a greater number of Native American inmates are present and volunteers can be found for the sweat lodge ceremony. As such, the prison's answer to Mann's request conforms to the constitutionally permissible Ohio policy, cited early, that both requires a minimum of five inmates in order to have access to prison facilities for congregate worship, and further conditions approval for ceremonies requiring a spiritual leader on the presence of a volunteer leader willing to participate.

### g.    *First Amendment/free exercise*

To the extent that the foregoing claims were also asserted as Constitutional violations of Mann's First Amendment right to the free exercise of his Native American religion, that premise fails for the same reasons as stated above. Specifically, because the RLUIPA protection is greater than that afforded by the First Amendment, conduct that does not violate RLUIPA cannot violate the First Amendment Free Exercise Clause.[107]

### 2.    *Retaliation - § 1983 claims*

To establish a claim of retaliation against the exercise of First Amendment rights, "a prisoner must prove that (1) he engaged in protected conduct, (2) the defendant took an adverse action that is capable of deterring a person of ordinary firmness from continuing to engage in that conduct, and (3) the adverse action was motivated at least in part by [the

---

[107] *Holt*, 135 S. Ct. at 859-60 (citation omitted).

prisoner's] protected conduct."[108]  Although retaliation can rarely be supported by direct evidence of the required intent, "conclusory allegations of retaliatory motive unsupported by material facts" are not sufficient to state a claim.[109]  To establish causation, the plaintiff must set forth "a chronology of events from which retaliation may plausibly be inferred."[110]

### a.    *The shipment containing tobacco*

Mann first alleges that various individual defendants retaliated against him for attempting to practice his religion, especially as relates to Mann's order of a pipe, kinnikinnick, sage, and sweet grass from an outside vendor that, when delivered, was found to contain tobacco and resulted in disciplinary action against Mann.[111]  As succinctly detailed by Mann, he challenges "defendants Rudy and Teffs for writing the false report [on this incident]; Smith for lying about the underlying facts, Murphy for refusing to perform his prescribed duty and dispose of it [the disciplinary complaint] when it was proven to be false; Major Reynolds for ordering Lt. Garcia to find [Mann] guilty; Lt. [Garcia] for doing so, and Benny Kelly for refusing to correct it."[112]

---

[108] *Hill v. Lappin,* 630 F.3d 468, 472 (6th Cir. 2010)(internal citation and quotation omitted).

[109] *Habin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005)(internal citation and quotation omitted).

[110] *Jones v. Greninger*, 188 F.3d 322, 325 (6th Cir. 1999)(internal citation and quotation omitted).

[111] ECF No. 138 at 24 (citing record).

[112] ECF No. 134 at 17.

The uncontested facts show that Mann was authorized by Chaplain Smith to purchase Native American religious supplies of sage, sweetgrass, a pipe, and kinickinnick.[113] Neither Chaplain Smith,[114] nor Mann,[115] was aware that the package, as delivered, would contain tobacco, which is a contraband item in prison.[116]  When the tobacco was discovered, Reynolds ordered that the package not be given to Mann, but that the entire package, including the non-contraband items, be shipped back to the vendor.[117]  Mann asserts that he was forced to pay for the return shipment, while the prison states that the package was returned at no cost to the inmate.[118]

A conduct report was written up against Mann for lying about ordering tobacco and for later possessing it.[119]  A hearing was held and Mann was found not guilty of lying about the circumstances of the order itself, but was found guilty of possessing contraband.[120]  He was ordered to serve ten days in segregated confinement, such sentence to be served only if

---

[113] *Id.* (citing record); ECF No. 138 at 24.

[114] ECF No. 138 at 24 (citing record).

[115] *See id.* at 25 (citing ECF No. 5, Ex. 14 at 2).

[116] *Id.*

[117] *Id.*

[118] *Id.*

[119] *Id.* at 26.

[120] ECF No. 5, Ex. 14 at 5.

-24-

Mann were subsequently found guilty of another violation of the contraband rule.[121]  Mann also claims that Chaplain Smith threatened to put Mann in segregation if Mann filed any grievance about this incident.[122]

Here, Mann was found guilty of violating a legitimate prison regulation against possessing tobacco.  He first attempts to argue against the guilty finding itself by claiming that he only had constructive possession and not actual possession of the tobacco.[123]  In that regard, as the Supreme Court noted in *Superintendent v. Hill*,[124] "[p]rison disciplinary proceedings take place in a highly charged atmosphere," and that decisions made in such proceedings will not be set aside by courts if they have "some basis in fact."[125]  A district court has no authority to review the resolution of factual disputes, re-weigh the evidence, or independently assess witness credibility.[126]

Moreover, courts have consistently rejected claims by inmates that a finding of possession of contraband should only rest on a showing of actual possession and not constructive possession.[127]  Finally, as the Sixth Circuit has stated, "[i]f a prisoner violates

---

[121] *Id.*

[122] ECF No. 134 at 19.

[123] *Id.* at 18.

[124] *Superintendent v. Hill*, 472 U.S. 445 (1985).

[125] *Id.* at 456.

[126] *Id.* at 455.

[127] *Boyd v. Butler*, No. 6:16-CV-27-GFVT, 2016 WL 4718147, at *6 (E.D. Ky. Sept. 7, 2016)(collecting cases).

a legitimate prison regulation, he is not engaged in 'protected conduct,' and cannot proceed beyond step one" of a First Amendment retaliation claim.[128]

Accordingly, Mann has presented no basis for a claim of retaliation arising out of the disciplinary finding that he possessed contraband.

That leaves the narrow claim that Mann incurred an adverse action when a claim of lying about ordering tobacco was also included in the original disciplinary report. As noted, this claim was later found at the hearing to be not credible and no disciplinary action was taken based on that original charge.

Where a prison provides a process to challenge a disciplinary complaint about a rule violation before any penalty is imposed, and that process results in the complaint being dismissed and no penalty is assessed, the dismissal is considered to have cured any due process violation that may have occurred by filing the original complaint.[129]  Conversely, a finding that a prisoner violated a prison regulation "essentially checkmates [a] retaliation claim."[130]

That said, Mann contends that the mere filing of a false charge in a conduct report and the subsequent prosecution of that charge within the prison disciplinary system, of itself, is retaliation and constitutes an adverse action sufficient to deter a person of ordinary firmness

---

[128] *Thaddeus-X v. Blatter*, 175 F.3d 378, 395 (6th Cir. 1999)(en banc).

[129] *Brown v. Dreyfus,* No. 9:11-CV-1298, 2013 WL 4026845, at *5 (N.D.N.Y. Aug. 6, 2013)(citation omitted).

[130] *Martin v. Posey*, No. 2:15-cv-2294, 2018 WL 348100, at *6 (S.D. Ohio Jan. 10, 2018)(citation and internal quotation omitted).

from exercising his constitutional rights.[131]  But "[e]rroneous or even fabricated allegations of misconduct by an inmate, standing alone, do not constitute a depravation of a constitutional right."[132]  Further, as set out by the district court in *Annabel v. Frost*,[133] only the making of false conduct report that could result in "major, significant sanctions" will qualify as an adverse action that would deter a person from engaging in protected conduct.[134] Falsely making a minor misconduct charge, such as one that does not potentially involve loss of good time credits or risk punitive segregation, is not an act of retaliation so egregious as to be considered an adverse action.[135]

Here, the charge against Mann was not sent to the serious misconduct panel, which addresses major violations of the inmate rules that could result in placement in extended restrictive housing.[136]  As such, the Rule 27 violation that was alleged, but not proven,

---

[131] ECF No. 134 at 21 (citing *Jacobs v. Pennsylvania Dep't of Corr.*, No. 04-1366, 2009 WL 3055324 (W.D. Pa. Sept. 21, 2009)).

[132] *Soledad v. Webb*, No. 1:18-cv-126, 2018 WL 2750318, at *7 (S.D. Ohio May 1, 2018)(citation omitted), *report and recommendation adopted by* 2018 WL 2735658 (S.D. Ohio June 7, 2018).

[133] *Annabel v. Frost*, No. 14-10244, 2015 WL 1322306 (E.D. Mich. Feb. 17, 2015), *report and recommendation adopted by* 2016 WL 270294 (E.D. Mich. Jan. 22, 2016).

[134] *Annabel*, 2016 WL 270294, at *3.

[135] *Id.* (collecting cases).

[136] *See* Ohio Admin. Code § 5120-9-08.1.

appears to not have involved the risk of "major, significant sanctions" such as would make its very filing a potential act of egregious retaliation amounting to an adverse action.[137]

Moreover, as observed in *Simmons v. Adamy,*[138] there is no evidence here that Mann was treated differently from other inmates who were incorrectly charged with violating a regulation; that his free exercise rights were affected in more than a *de minimus* way by having the hearing process proceed to his vindication; nor that Mann was subject to any further consequences as the result of the incorrect discipline charge.[139]

Mann's claim here highlights why courts approach prisoner retaliation claims "with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation – can be characterized as a constitutionally proscribed retaliatory act."[140]

---

[137] Mann himself has characterized the offense of possessing contraband, for which he was found guilty, as only involving a "petty" (ECF No. 5, Ex. 44 at ¶ 26) or "minor" (ECF No. 5, Ex. 44 at ¶ 32) violation.  He also explicitly denied that he was sent "to the hole" for this violation.  ECF No. 5, Ex. 44 at ¶ 19.  The parole board likewise characterized this offense, as well as the other "tickets" he received in prison, as "minor," although they stated these offenses were cumulatively "indicative of [Mann] failing to follow the rules of the institution." ECF No. 5, Ex. 45.

[138] *Simmons v. Adamy*, 987 F. Supp. 2d 302 (W.D.N.Y. 2013).

[139] *See id.* at 306-07.  The existence of the incorrect charge of lying did not appear to be mentioned as a factor by the parole board in its decision to deny Mann release in 2013. ECF No. 5, Ex. 45.

[140] *Davis v. Goord,* 320 F.3d 346, 352 (2nd Cir. 2003)(internal quotation marks omitted).

Finally, as the defendants assert, even if Mann were somehow able to show that retaliation for his practice of his religion was the motivating factor for all the actions cited above, the defendants state that they would have taken the same action in the absence of any evidence that Mann was practicing his religion.[141]  If the defendants can make this showing, they are entitled to summary judgment.

Mann also claims that Chaplain Smith retaliated against Mann by threatening him with placement in segregation if Mann filed any grievance or contacted the Warden regarding Mann's allegation that Smith lied about not pre-approving the order that contained tobacco.[142] Although Mann makes this allegation, Smith admitted to the clerk that received the package that he was aware of the order,[143] and Smith's signature is fully apparent on the order form itself.[144] Both Smith and Mann each believed the order did not include tobacco.[145] Indeed, Mann was cleared of the charge that he had lied to the prison staff precisely because the review board believed Mann's testimony, as supported by the facts, that Mann did not intend to order tobacco.[146]

---

[141] ECF No. 138 at 29 (citing record).

[142] ECF No. 134 at 19.

[143] ECF No. 5, Ex. 14.

[144] *Id.*, Ex. 16.

[145] ECF No. 138 at 25 (citing record).

[146] ECF No. 5, Ex. 14 at 4-5.

Because Mann was found not guilty of lying to staff that he had knowingly ordered tobacco, he is here precluded from now claiming that Chaplain Smith attempted to retaliate against him if Mann took action to show that Chaplain Smith had pre-approved the order of tobacco.  Essentially, if Mann's premise is granted here – that Chaplain Smith knowingly approved  the order of tobacco and then threatened Smith if he filed a grievance that Smith purportedly denied his approval – then such premise contradicts the finding that exonerated Mann from the charge of lying – *i.e.*, that neither Mann nor Smith knew in advance that the shipment would contain tobacco.

Because Mann's § 1983 claim now does not involve his conviction itself or the length of his sentence, this issue preclusion is not based on the rule in *Heck v. Humphrey*.[147] Nonetheless, the factual finding by the Ohio prison review panel that neither Mann nor Smith knew that the shipment would contain tobacco now precludes Mann from maintaining a position in this matter that would require a contrary factual finding.[148]

Mann has not shown that any actionable retaliation occurred in connection with the disciplinary proceeding that followed his receipt of contraband.  Defendants Rudy, Teffs, Reynolds, and Smith are entitled to summary judgment.

**b.    *Strip search/cell search/mail delivery***

Mann contends that in retaliation for filing grievances concerning the conduct report, he was subjected to targeted strip searches, cell searches, and the withholding of mail by

---

[147] *Heck v. Humphrey*, 512 U.S. 477 (1994).

[148] *Peterson v. Johnson*, 714 F.3d 904, 918 (6th Cir. 2013).

defendants Glowacki, Costin, Scott, and Lumen.[149]  These defendants assert that Mann failed to exhaust his administrative remedies as to these claims against them.[150]

Initially, these defendants maintain that while Mann filed an informal complaint resolution form against Glowacki, Costin, Scott, and an unnamed officer for the conduct at issue here, Mann's subsequent steps on appeal make no mention of these defendants nor of allegedly improper searches.[151]  Rather, the record shows that after initially filing the informal complaint, Mann was informed that the searches were ordered because it was suspected that Mann possessed contraband.[152]  Apparently believing the purportedly improper searches had ended when no contraband was discovered,[153] Mann then proceeded to the next step in the grievance process by generally stating that he included by reference everything mentioned in the initial complaint, but focusing on an assertion that what began as retaliatory searches had "developed into the situation with medical" whereby he was being denied prompt medical care.[154]

---

[149] ECF No. 134 at 19 (citing record).

[150] ECF No. 138 at 39.

[151] *Id.* at 41 (citing record).

[152] *Id.*

[153] *See* ECF No. 5, Ex. 18 at 2.

[154] *Id.*

The response by the prison was that the rules require that an initial complaint be filed with the supervisor of the unit where the inmate alleges a difficulty.[155]  The chief inspector noted that Mann filed the initial complaint in this instance with Captain Glowacki, alleging improper searches, and not with medical services alleging difficulties with receiving timely care.[156]  The chief inspector clearly stated that "[t]he medical services [area] and the captain have nothing to do with one another."[157]  Consequently, the present grievance procedure, which was founded on a complaint about improper searches, "would not be reviewed further," and Mann was told to start again by filing a new grievance with medical services.[158]

The record shows that no new grievance was filed.

To properly exhaust administrative remedies, a prisoner must "take advantage of each step the prison holds out for resolving the claim internally" in a manner which permits the prison to review, and if necessary correct, the problem.[159]  To exhaust a prisoner complaint in Ohio, the prisoner must present his grievance through each step of a three step process in compliance with prison grievance procedure.[160]  When a prisoner's complaint contains both

---

[155] *Id*. at 6.

[156] *Id.*

[157] *Id.*

[158] *Id.*

[159] *Starner v. Clark*, No. 2:05-cv-2764, 2016 WL 1090977, at *3 (S.D. Ohio March 21, 2016)(citations omitted), *report and recommendation adopted by* 2016 WL 1643039 (S.D. Ohio April 26, 2016).

[160] *Starner*, 2016 WL 1090977, at *3 (internal quotations and citations omitted).

exhausted and unexhausted claims, the reviewing court is to dismiss the unexhausted claims but retain and address the exhausted ones.[161]

Here, as documented in the record, Mann did not follow proper prison grievance procedure by attempting to "develop" a claimed grievance about searches, which was initially presented to Captain Glowacki, into a grievance about medical care, which was never initially asserted to the medical staff. Whatever Mann may believe about the interrelation of these grievances – *i.e.*, they are both examples of retaliatory harassment[162] – the two claims are distinct as concerning two areas of prison operation and were required to have gone through a full review process upon being initially submitted to the appropriate area.

As such, and by the clear finding of the prison authorities in applying Ohio law, Mann did not fully exhaust his claims against defendants Glowacki, Costin, and Scott because his specific claims against them were not fully presented through all stages of the established grievance process.  Thus, claims against these defendants should be dismissed.  Similarly, and for the same reasons stated above, any claims arising from a purported lack of timely medical care likewise were not fully exhausted and should also be dismissed.  Moreover, because there is no particular grievance ever asserted against defendant Lumen for alleged delays in receiving mail, those claims against this defendant should also be dismissed.

---

[161] *Reynolds-Bey v. Harris*, 428 Fed. App'x 493, 500 (6th Cir. 2011)(citation omitted).

[162] ECF No. 134 at 20.

*c.*     ***Respondeat superior***

As noted above, all claims against defendants Kelly/Epinger, Spatney/Armbruster, Krandall/Grudzien, Garcia, Murphy, and Jackson are concerned solely with failing to exercise proper supervision or in virtue of participation in the prison grievance system.  It is well-settled that the doctrine of *respondeat superior* does not permit a plaintiff to impute liability under § 1983 to supervisors.[163]  Similarly, an alleged failure to adequately investigate claims of misconduct also does not rise to the level of "encourag[ing]" misconduct such as could create liability under § 1983.[164]  "Prison officials whose only roles 'involve their denial of administrative grievances and their failure to remedy the alleged [unconstitutional] behavior cannot be liable under § 1983.'"[165]

Accordingly, these defendants are entitled to summary judgment in their favor as to all claims asserted against them.

## Conclusion

For the reasons stated, all defendants are entitled to summary judgment as to all claims asserted against them. All outstanding motions should be denied as moot.


Dated: July 31, 2018                                   s/ William H. Baughman, Jr.
                                                        United States Magistrate Judge

---

[163] *Wingo v. Tennessee Dep't of Corr.,* 499 Fed. App'x. 453, 455 (6th Cir. 2012)(per curiam).

[164] *Soledad*, 2018 WL 2750318, at *7 (citations omitted).

[165] *Id.* (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)).

-34-

## Objections

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the District Court's order.[166]

---

[166] *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).